ANDERSON *v.* STONE.

4-3649

Opinion delivered January 7, 1935.

*Murphy & Wood,* for appellants.

*George P. Whittington, Leo P. McLaughlin,* and *Trieber & Lasley,* for appellees.

BUTLER, J.   The Hot Spring Savings Trust & Guaranty Company, usually known as "The Security Bank," was taken over by the State Banking Department on August 30, 1933, and Thomas W. Stone was appointed as Special Deputy Bank Commissioner in charge of said bank.   An inventory of the assets was filed in the chancery court and given a docket number by the clerk, and entered on the docket of that court.   The appellants, some of the stockholders of the Security Bank, intervened with the prayer that the appointment of Thomas W. Stone be canceled, and that the State Bank Commissioner be enjoined from declaring an assessment of the stock owned by the appellants.   At the hearing of the intervention, the chancery court entered a decree dismissing the same for want of equity, from which is this appeal.

From the records introduced in evidence and the testimony of witnesses the following facts appear:   For a number of months preceding the first of January, 1932, there had been steady withdrawals of cash by the customers of the bank, so that its available cash on that date was materially reduced.   So much so that in the early days of January, 1932, the bank made an arrangement with the Union Trust Company of Little Rock by which there would be an apparent addition to its cash reserve

of $25,000. At this time the Security Bank kept a part of its cash on deposit with the Union Trust Company. This was being withdrawn, and on or about the 4th of January, 1932, the Union Trust Company charged back to the Security Bank the $25,000 item, reducing its cash reserve by that amount. The withdrawals from the Security Bank became accelerated, and on January 5, 1932, a ''run'' on the bank began, which was resumed on the morning of the next day and continued throughout that day. During that day it was necessary for the Security Bank to borrow cash from the Arkansas National Bank. With this aid the Security Bank was enabled to keep its doors open throughout that day, but at the closing hour there was no abatement in the withdrawals. During that day a tentative arrangement was made with the Arkansas National Bank and Arkansas Trust Company for further aid. In the meantime the Security Bank was communicating with the State Banking Department with the view that the department take over the bank if arrangements then pending for its relief could not be consummated.

On the morning of January 7, 1932, a representative of the State Banking Department arrived in Hot Springs before banking hours. At this time the cash reserve was approximately $22,000 below the legal requirement. The representative of the banking department was advised that arrangements had been perfected by which the Arkansas National Bank and the Arkansas Trust Company would furnish the Security Bank sufficient cash for it to remain open during January 7. He met with the officers of the three banks and notified them that this arrangement was not satisfactory, and that the Security Bank could not open unless some definite assurance was given by the aiding banks that they would guarantee payment in full to the depositors and all other creditors, the reason being that, if the Security Bank was kept open only through that day, the depositors who withdrew their money would secure a preference over other depositors who were not joining in the run. The two aiding banks agreed to the requirement of the banking department, and continued to supply cash for the Security Bank dur-

ing the banking hours of January 7. At the closing of the bank on that day the bank was filled with depositors who were attempting to withdraw money. Before closing the tellers' cages, in order to appease the depositors, an announcement was made to the effect that the Security Bank was to be taken over by the Arkansas National Bank, and all the depositors who wanted their money would be paid the next day at that bank just across the way. Between the closing hour on the 7th and the opening hour on the 8th of January, it was ascertained that the amount required to be furnished to pay the remaining deposits and other debts was $643,358.71. The assets of the Security Bank during this interval were examined and classified, and it was found that said bank had cash, sight exchange and cash collections, amounting to $47,-160.02; that it had loans of a nature to justify the other banks in purchasing them, with recourse, in the sum of $340,221.60, and bonds, securities, etc., of a like nature in the sum of $45,381.62, making a total of $432,381.62. The remaining assets were such that they were not eligible for National bank investment, even with recourse indorsement. Bills receivable of this class amounted to the sum of $219,845.13. When these figures were ascertained, the board of directors of the Security Bank and of the Arkansas National Bank authorized an agreement which was then entered into between the two banks naming the Security Bank as the "first party," and the Arkansas National Bank of Hot Springs as "second party." This agreement, omitting the formal parts, is as follows:

"In consideration of second party assuming and agreeing to pay all of the liabilities of first party, save and except its liabilities to its stockholders, a complete list of the liabilities of said first party as shown by its books at the close of business January 7, 1932, appearing on attached Exhibit A, and its supporting schedules, to the aggregate amount of six hundred forty-three thousand three hundred fifty-eight 71/100 dollars ($643,-358.71), first party does hereby sell, assign, transfer, set over and deliver unto second party its assets as are fully described in attached Exhibit B, and its supporting

schedules to the aggregate amount of four hundred thirty-two thousand three hundred eighty-one 62/100 dollars ($432,381.62), and has this day executed and delivered to said second party its promissory note for the sum of two hundred ten thousand nine hundred seventy-seven 09/100 dollars ($210,977.09), due and payable six months from date, at the office of The Arkansas National Bank of Hot Springs, for the payment of which note first party has assigned as collateral security various of its assets as are listed in attached Exhibit C; (amounting to $219,845.13) and, as further security for the payment of said promissory note, has executed its certain deed of trust, of even date herewith, conveying all of its real property, furniture, fixtures, appliances, etc., to the trustee named in said deed of trust, and subject to the terms and conditions of said deed of trust.

"First party further agrees and does hereby pledge all of its real and personal property described in said deed of trust, and all of the assets enumerated in Exhibit C, and its supporting schedules together with all of its assets of every kind and character, including amounts due from any and all sources, whether or not appearing on its books at this time, to the payment of said note for $210,977.09, and for the further purpose of guaranteeing to second party the full liquidation of all of the assets included in Exhibit B and its supporting schedules.

"First party hereby guarantees that all of its liabilities are shown by its books or are set forth in Exhibit A, and its supporting schedules attached hereto. First party further agrees that it will through its board of directors do and perform all the acts and deeds necessary to effect the legal transfer of its assets to said second party, and necessary to carry out the spirit of this agreement, including the execution of all proper conveyances of its real estate to second party, or its trustees, or nominees, and the transfer of all policies of fire, tornado and burglary insurance and the surety bonds on its officers and employees, and the legal transfer of the entire business of its trust department.

"It is further agreed and understood that the Arkansas National Bank of Hot Springs, second party, shall

have the right and privilege to, from time to time, take renewal notes, to make settlements, and to compromise claims of any of said assets of first party transferred to it whether as collateral or otherwise, and that, until said second party actually receives the money thereon, that the same shall not constitute or be considered as a payment of said obligation; and any remaining collateral after the payment of said note for $210,977.09 shall first be applied to the payment in full of any balance of any of the assets shown in Exhibit B, upon which the said second party shall not have received full payment of principal and interest.

"Second party agrees and hereby contracts to assume and pay all of the liabilities of first party as hereinbefore set forth."

The agreement was carried into effect immediately by the assignment with recourse of the bonds, securities and bills receivable and transfer of cash, making a total of $432,381.62, and a promissory note, executed and delivered, representing the difference between the sum of the assets first named and the indebtedness, $643,358.71, for the payment of which was pledged the remaining receivables, and, to further secure the same a deed of trust was executed covering all of the real property of the Security Bank.

Between the closing hour on the 7th of January and the morning of the 8th, the cash, bonds and securities, bills and notes receivable, together with the books of the Security Bank were transferred from the Security Bank building to that of the Arkansas National Bank, and the employees of the Security Bank, with the exception of its president and janitor, moved into the Arkansas National Bank building where they were retained for a number of months, their salaries being paid by the Arkansas National Bank with the understanding that to these salaries the Security Bank would contribute $100 per month, although it does not appear whether this sum was paid by the Security Bank.

On the morning of the 8th of January, 1932, the Arkansas National Bank caused to be inserted in a morning newspaper an announcement to the effect that it, with the

Arkansas Trust Company participating, had acquired the assets of the Security Bank and assumed all liability to its depositors, and that customers of that bank were requested to transact their business at the Arkansas National Bank from and after that date. In the same issue was a news story containing a statement that the Security Bank had been purchased by the Arkansas National Bank and the Arkansas Trust Company, and that its business would be transacted thereafter at the Arkansas National Bank.

Pursuant to the agreement the Arkansas National Bank paid the debts of borrowed money, listed as "bills payable," in the sum of $186,254.62, and paid to the depositors the amounts of their several deposits in cash or entered the same as deposits of the Arkansas National Bank according to the desire of each depositor. Between the 8th of January, 1932, and August 30, 1933, the Board of Directors of the Security Bank met occasionally in the Security Bank building for the transaction principally of routine matters. At some of the meetings resolutions were adopted in aid of, and to carry into effect, the aforesaid agreement. During this time no deposits were accepted by the Security Bank or any business transacted except the rental of the safety deposit boxes and the collection of rents arising out of the real estate mortgaged to the Arkansas National Bank. When any moneys were collected from any source, they were paid into the National Bank to be credited on the note of the Security Bank.

A number of other facts appear in the evidence relating to stockholders' meetings after January 8, 1932, which, in view of the conclusion we have reached, are unnecessary to be stated. There was evidence also relating to the knowledge of appellant stockholders of the nature of the agreement entered into between the two banks, which, for the same reason as that relating to the facts of the stockholders' meetings, we do not set out.

The appellants' theory of the case is stated by them in the following language: "Appellants insist that the transaction between the two banks was not a pledging of assets in the regular course of business, which a bank

would have a right to do as a necessary incident to carrying on a banking business; but it was 'an acquisition by one bank of all the assets of another bank,' and is controlled by § 677 of Castle's First Supplement.'' Based upon this theory, appellants contend that the transaction of January 8, 1932, was *ultra vires* as not being authorized by a vote of two-thirds majority of the stockholders; that, therefore, the debts due the Arkansas National Bank by the Security Bank were not incurred in the due course of business, and that because of this the statutory double liability does not apply. In support of this contention appellants rely upon the decision of this court in the case of *Taylor* v. *Jonesboro Trust Co.*, 183 Ark. 903, 39 S. W. (2d) 326, where it was held that where a bank, a going concern, had sold its entire assets to another bank and the purchasing bank becomes insolvent, the Bank Commissioner has no authority to take charge of the assets of the selling bank or abrogate the sale, his authority being limited to its exercise over the purchasing bank.

We are of the opinion that many of the circumstances emphasized by the appellants are unimportant, and much of the argument of learned counsel is irrelevant, as the nature of the transaction must be ascertained from the terms of the agreement itself, and that the agreement shows that there was not ''an acquisition by one bank of all of the assets of another bank'' within the meaning of the statute, but rather that the effect of the transaction was a payment of the many creditors of the Security Bank by the Arkansas National Bank, thus making the latter bank practically the sole creditor of the Security Bank; and that, for the payment of this debt, there were pledged the assets of the Security Bank, and the directors of the latter bank were clothed with authority to consummate this transaction by virtue of the provisions of § 18, act 627 of the Acts of 1923. That section recognizes the power of banks to pledge assets as security for money borrowed, but limits the exercise of that power to cases where express authority is given by the board of directors to be reflected in the minutes of the meeting

held for such purpose. This authority is further limited so as to require the prior written consent of the Bank Commissioner where the face value of the assets pledged exceeds in the aggregate "all of the collateral of said bank then securing said loan one and one-half times the principal sum of said loan."

The express authority for the pledge in the instant case was made by the board of directors, and reflected in the minutes of its meeting, and, since the collateral pledge did not exceed one and a half times the principal sum of the loan, the written consent of the Bank Commissioner was not required. While the facts here are different in many particulars from those in the case of *Poch* v. *Taylor,* 186 Ark. 618, 54 S. W. (2d) 994, we are of the opinion that the principles announced therein are applicable to the transaction in this case. In the case of *Poch* v. *Taylor, supra,* the agreement between the insolvent bank and certain other banks was that the latter agreed to, and did, lend money to the former to pay its depositors in consideration of a pledge of its assets including the statutory liability of its stockholders. This was held to constitute the lending banks creditors and not purchasers of the insolvent bank, and, as such, that they were entitled to participate in the proceeds recovered from stockholders under the assessments of the Bank Commissioner. We deem it immaterial whether the money to the depositors was paid out by the insolvent bank or the lending bank.

On the morning of January 7, 1932, the officers and directors of the Security Bank were forced to decide upon one of two courses to be taken—whether to surrender the bank to the State Banking Department as an insolvent bank, or to enter into the agreement with the national bank by which its creditors would be paid immediately without a long and perilous course of liquidation. They chose the latter course which may, or may not, have been the better one, but their action under the circumstances was a legitimate exercise of discretion. The directors were faced with grave financial difficulty. It was their primary duty to meet the liability of the bank to the depositors and other creditors, and, with this

situation confronting them, the pledge of all of the assets of the bank to secure the assumption and payment of these liabilities must be deemed to have been in due course of business, and for the debt thus incurred the stockholders were liable under § 702 of Crawford & Moses' Digest, although there was no express provision made for stockholders' liability in the agreement whereby the liabilities of the Security Bank were assumed by, and its assets pledged to, the Arkansas National Bank.

It follows that the decree of the trial court should be, and is, hereby affirmed.

MEHAFFY, J., dissents.